Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL III

| Pedro L. Salinas Moreno Peticionario <br><br> Gloria E. Machado Rodríguez <br><br> V. <br><br> Ex parte | TA2026CE00343 | *CERTIORARI* procedente del Tribunal de Primera Instancia Sala Superior de Carolina <br><br> Civil Núm. F DI2017-0094 <br><br> Sobre: Divorcio – Consentimiento Mutuo |
|---|---|---|

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Rivera Torres y el Juez Marrero Guerrero.

**Hernández Sánchez, Juez Ponente**

### RESOLUCIÓN

En San Juan, Puerto Rico, a 7 de mayo de 2026.

El 19 de marzo de 2026, el Sr. Pedro Salinas Moreno (señor Salinas o el peticionario) compareció ante nos mediante un *Certiorari Civil* y solicitó la revisión de una *Resolución* que se dictó el 9 de febrero de 2026 y se notificó el 17 de febrero de 2026 por el Tribunal de Primera Instancia, Sala Superior de Carolina (TPI). Mediante el aludido dictamen, el TPI mantuvo la pensión excónyuge impuesta en beneficio de la Sra. Gloria E. Machado Rodríguez (señora Machado). Sin embargo, la redujo a cuatrocientos ($400.00) dólares mensuales, efectivo el 1 de marzo de 2026. Determinó que el señor Salinas aún contaba con la capacidad económica para sufragar dicha suma mensual, toda vez que no demostró la existencia de un cambio sustancial en sus fuentes de ingresos.

Por los fundamentos que expondremos a continuación, **denegamos** el recurso de epígrafe.

I.

El 27 de junio de 2017, el señor Salinas y la señora Machado presentaron una *Petición* ante el TPI solicitado la disolución de su

matrimonio por consentimiento mutuo.[1] Además, como parte de ésta, acordaron a unas estipulaciones, entre ellas, la siguiente:

4. Pensión Pendente Lite:

a. Se establece una pensión pendente lite de $500.00 mensuales. En los primeros cinco (5) días de cada mes el Sr. Salinas entregará a la Sra. Machado la cantidad de $250.00 y los otros $250.00 entre los días 15-20 del mes para sus gastos personales tales como: salón de belleza, ropa, efectos personales, gasolina, teléfono celular toto ello comenzando en junio de 2017. En adición el Sr. Salinas extenderá a la Sra. Machado la cubierta de plan médico que este tenga para sí. Este acuerdo de pensión continuara como pensión excónyuge hasta tanta se venda la propiedad. En tal caso se procederá a modificar la misma en vista de la(s) alteración(es) sustanciales en la situación, la necesidad, los ingresos y la fortuna de uno u otro excónyuge.

Posteriormente, el 11 de agosto de 2017, se celebró una vista en su fondo y ese mismo día, el TPI emitió una Sentencia.[2] Allí, declaró Ha Lugar la petición de divorcio por consentimiento mutuo, y, en consecuencia, decretó roto y disuelto el vínculo matrimonial existente entre la señora Machado y el señor Salinas. Además, en lo pertinente, aprobó los acuerdos relacionados a la pensión Pende Lite en beneficio de la señora Machado.

Seis meses después de dictada la sentencia de divorcio, el 22 de febrero de 2018, el señor Salinas solicitó una rebaja de pensión, mientras la señora Machado pidió un aumento.[3] El TPI denegó ambos petitorios y también la reconsideración del señor Salinas. Paralelamente, la señora Machado obtuvo una orden de protección que conllevó el desalojo del señor Salinas del inmueble ganancial. Aunque este dejó de pagar las utilidades, el TPI le ordenó continuar pagando tanto las utilidades como las hipotecas.

---

[1] *Véase*, Entrada Núm. 4 del apéndice del recurso, SUMAC TA.
[2] *Véase*, Entrada Núm. 3 del apéndice del recurso, SUMAC TA.
[3] Estos hechos procesales se desprenden del dictamen recurrido y se incluyen con el propósito de facilitar una mejor comprensión del trámite procesal del caso.

El 22 de mayo de 2019, el peticionario volvió a solicitar la rebaja o cese de la pensión, a lo cual la recurrida se opuso. El TPI denegó nuevamente ambas solicitudes. Posteriormente, la señora Machado solicitó un pago adicional de $175.00 mensuales por concepto de plan médico, lo cual fue impugnado por el peticionario y finalmente denegado por el TPI. El 30 de agosto de 2019, las partes acordaron vender el inmueble ganancial sin obtener ganancias, resolviéndose así la controversia sobre su liquidación, con un crédito de $547.50 a favor del señor Salinas.

Luego de varios años, el 10 de enero de 2025, la señora Machado presentó una *Urgente Moción de Desacato & Solicitud de Revisión de Pensión Ex Cónyuge*.[4] En primer lugar, reiteró algunos de los acuerdos que se habían estipulado entre las partes, entre ellos, el pago de $500.00 mensuales por concepto de pensión excónyuge que el señor Salinas se comprometió a pagarle. Luego, señaló que el señor Salinas, a sabiendas de los acuerdos alcanzados entre las partes, incumplió con sus obligaciones al dejar de pagar las mensualidades hipotecarias de la propiedad ganancial, así como su plan médico. Sostuvo que la propiedad ganancial fue ejecutada y vendida por el banco por un precio menor a su valor y que, debido a los intereses acumulados por la falta de pago, no quedó sobrante alguno producto de la venta.

Por otro lado, indicó que actualmente residía en un hogar para personas de la tercera edad con ayudas de fondos federales, teniendo una obligación mensual de $137.00 por concepto de renta, además de gastos de servicios esenciales y necesidades básicas. Expuso que toda su vida se había desempeñado como ama de casa y había dependido económicamente de su exesposo, por lo que dependía de la pensión excónyuge para su sustento, la cual

---

[4] *Véase*, Entrada Núm. 1 del apéndice del recurso, SUMAC TA.

resultaba insuficiente ante el aumento en el costo de vida y sus necesidades actuales.

Sostuvo que el señor Salinas dejó de pagar la pensión excónyuge correspondiente al mes de enero de 2025, alegando, mediante comunicación remitida a la hija de las partes, que, por instrucciones de sus abogados, podía cesar dichos pagos. Alegó que el señor Salinas había incrementado sus ingresos, continuaba laborando en el negocio que estableció durante el matrimonio y había recibido ingresos adicionales, incluyendo compensaciones por reclamaciones judiciales y premios monetarios. Añadió que el señor Salinas no incurría en gastos extraordinarios significativos, ya que dejó de pagar la hipoteca y residía en la vivienda de un familiar.

Finalmente, afirmó que las partes no habían contraído nuevas nupcias y que, por ende, continuaba soltera y sin capacidad de generar ingresos adicionales debido a su edad y falta de preparación académica. Así pues, solicitó que se le ordenara al señor Salinas continuar pagando la pensión excónyuge bajo apercibimiento de desacato y que se señalara una vista para la revisión y aumento de dicha pensión conforme a sus necesidades actuales.

En respuesta, el 9 de mayo de 2025, el señor Salinas presentó una *Moción en Cumplimiento de Orden, Oposición a Solicitud de Alimentos y Solicitud de Archivo*.[5] En esta, se opuso enfáticamente a la solicitud presentada. Señaló que, conforme a las estipulaciones de la Sentencia de Divorcio, tenía la obligación de pagar una pensión excónyuge de $500.00 mensuales desde junio de 2017 hasta la venta de la propiedad ganancial, momento a partir del cual la pensión quedaría sujeta a revisión según cambios sustanciales en las circunstancias de las partes. Indicó que la pensión estuvo vigente hasta la venta del inmueble y que, conforme al Código Civil

---

[5] *Véase*, Entrada Núm. 5 del apéndice del recurso, SUMAC TA.

de 2020, su fijación y modificación dependía de factores como la necesidad, los ingresos, la edad, la salud y la capacidad de generar ingresos de ambos excónyuges.

Sostuvo que era una persona de edad avanzada protegida por ley, con necesidades apremiantes de salud, vivienda y sustento. Señaló que devengaba únicamente $300 mensuales de Seguro Social, que ya no trabaja como entrenador de caballos y que, aun cuando lo hacía, sus ingresos eran limitados y apenas cubrían los gastos operacionales. Asimismo, indicó que su situación económica había empeorado y que eventualmente necesitará costear un hogar de cuido prolongado.

Afirmó que cumplió e incluso excedió lo dispuesto en la sentencia de divorcio. Reconoció que, tras el divorcio en el año 2017, las partes acordaron permanecer en el hogar hasta su venta, y que él asumiría las deudas y el pago de las hipotecas y la pensión. Sin embargo, expresó que, tras el paso del huracán María, el Hipódromo Camarero cesó operaciones, afectando sus ingresos, lo que lo obligó a trasladarse a Estados Unidos temporalmente para trabajar. Alegó que, a su regreso, fue expulsado del hogar por la señora Machado, quedando en condiciones precarias de vivienda, aun así, continuando con el pago de la pensión.

Manifestó que, ante lo antes expresado, vivió en condiciones sumamente precarias durante meses, incluso en instalaciones del hipódromo, mientras continuaba cumpliendo con sus obligaciones económicas. Asimismo, indicó que continuó pagando ambas hipotecas y gestionó una modificación con una de las instituciones bancarias. Afirmó que, en el año 2021 surgió un comprador y ambas partes acordaron la venta del inmueble, negando que la venta fuera consecuencia exclusivamente de sus actos. Además, expresó que la señora Machado se adjudicó unilateralmente los bienes muebles del hogar.

Aseguró que, a pesar de su situación económica y de salud, el continuó pagando la pensión excónyuge hasta enero de 2025, momento en que no pudo continuar haciéndolo. Además, adujo que la señora Machado no acudió al tribunal con las manos limpias, al omitir que recibió una herencia sustancial, realizaba viajes de lujo y poseía un vehículo nuevo, además de contar con el apoyo de los hijos de las partes.

Ante ello, invocó el principio de equidad y la doctrina de manos limpias, argumentando que la señora Machado había omitido información relevante y había contribuido a la situación actual. Sostuvo que esta incumplió el acuerdo al expulsarlo del hogar, afectando su situación económica y el proceso de venta; que consintió la venta de la propiedad; que se adjudicó bienes muebles sin autorización; y que mantenía un estilo de vida que contradecía su alegada necesidad. También alegó que la señora Machado tiene capacidad de generar ingresos mediante empleos accesibles.

Finalmente, concluyó que la solicitud presentada era improcedente. Argumentó que, de interesar una pensión, la señora Machado debe instarla en un nuevo pleito y probar su necesidad conforme a derecho. Por tanto, solicitó que se declarara sin lugar la solicitud de desacato y de pensión excónyuge, se diera por cumplida la orden de mostrar causa y se ordenara el archivo del caso.

El 20 de junio de 2025, el Sr. Salinas solicitó la transferencia de la Vista de Desacato y Revisión de Pensión Excónyuge, alegando razones médicas de su abogada, y reiteró que procedía el archivo del caso.[6] Mediante *Orden* del 24 de junio de 2025, el TPI declaró No Ha Lugar a dicha solicitud de archivo. Posteriormente, el 30 de junio de 2025, el TPI dictó una *Orden* advirtiéndole al señor Salinas que no

---

[6] Estos hechos procesales se desprenden del dictamen recurrido y se incluyen con el propósito de facilitar una mejor comprensión del trámite procesal del caso.

había sido relevado de la pensión excónyuge y que en la vista evidenciaria se tomaría una determinación final.

Inconforme, el 4 de agosto de 2025, el peticionario presentó una moción de reconsideración, a la cual la recurrida se opuso. Así las cosas, el 8 de agosto de 2025, el TPI dictó una *Resolución* en la cual denegó la reconsideración y reiteró que el caso no había sido archivado, que el señor Salinas no había sido relevado de la pensión excónyuge y que estaba pendiente la celebración de la vista sobre el cese o revisión de dicha pensión.[7] Asimismo, les concedió a las partes un término de 30 días para culminar el descubrimiento de prueba y certificarlo.

El Sr. Salinas no cumplió con el descubrimiento de prueba, por lo que, mediante *Orden* del 18 de noviembre de 2025, el TPI le anotó la rebeldía.[8] Por su parte, la señora Machado solicitó varias órdenes contra instituciones financieras con el propósito de conocer la capacidad económica y los ingresos del señor Salinas. El 10 de noviembre de 2025, la Sra. Machado presentó su informe de conferencia, en el cual anunció prueba testifical y documental.

El 9 de febrero de 2026, se celebró la vista evidenciaria sobre el relevo y/o la revisión de la pensión excónyuge.[9] Ambas partes comparecieron representadas por sus respectivos abogados. También compareció la hija de las partes, la Sra. Glorimar Salinas Machado. La recurrida renunció al testimonio de su hijo Pedro por considerarlo prueba acumulativa, mientras que el otro hijo, Alvin, no compareció. Durante la vista, las partes estipularon la admisión en evidencia del Exhibit 1 de la señora Machado, el cual contiene 20 documentos. Además, prestaron testimonio el señor Salinas como

---

[7] *Véase*, Entrada Núm. 8 del apéndice del recurso, SUMAC TA.
[8] *Véase*, Entrada Núm. 6 del apéndice del recurso, SUMAC TA.
[9] Estos hechos procesales se desprenden del dictamen recurrido y se incluyen con el propósito de facilitar una mejor comprensión del trámite procesal del caso.

testigo hostil de la señora Machado, la hija de las partes, la Sra. Glorimar Salinas Machado, y la propia señora Machado.

Celebrada la vista, ese mismo día, a saber, el 9 de febrero de 2026, el TPI dictó una *Resolución* que se notificó el 17 de febrero de 2026.[10] En primer lugar, formuló las siguientes determinaciones de hechos:

1. El Sr. Salinas se desempeña como jurado hípico del Hipódromo Camareno desde marzo de 2025 y gana $25 la hora y trabaja 29 horas semanales.

2. Actualmente, el Sr. Salinas está pagando la pensión excónyuge de $500 mensuales y saldó la deuda que tenía con la Sra. Machado por ese concepto.

3. Además, el Sr. Salinas recibe $348.00 mensuales por concepto del Seguro Social.

4. El Sr. Salinas luce como un hombre saludable, ágil, inteligente y capaz.

5. El Sr. Salinas aseguró que actualmente no es criador de caballos, pero en las publicaciones del Hipódromo Camareno se le anuncia como tal razón por la cual, el Tribunal no le dio credibilidad a esta parte de su testimonio.

6. El Sr. Salinas explicó que aparecía su nombre en dichas publicaciones, así como depósitos en su cuenta del First Bank, porque "prestó" su nombre para aparecer como "dueño" de un caballo sin ser eso cierto (el caballo se llama IL Corsario).

7. La Asociación de Criadores era quien hacía los depósitos en la cuenta de First Bank del Sr. Salinas.

8. El Sr. Salinas también explicó que no recibe el 2% de las ganancias cuando dicho caballo gana las carreras, pero el Tribunal tampoco le dio credibilidad a esta parte de su testimonio.

9. El Sr. Salinas reconoció que el "prestar" su nombre para aparecer como "dueño" de un caballo sin ser cierto iba en contra de las reglas del Hipódromo.

10. El Sr. Salinas conoce muy bien las reglas del Hipódromo porque ha sido jockey, entrenador y criador de caballos.

11. Previamente, del 2024 a marzo de 2025 el Sr. Salinas trabajó como entrenador de caballos para tres (3) perdonas: Rey Delgado, RJA y Luis Passalaqua: más adelante se verán los ingresos devengados.

---

[10] *Véase*, Entrada Núm. 2 del apéndice del recurso, SUMAC TA.

12. El Sr. Luis Passalaqua fue quien supuestamente le solicitó al Sr. Salinas que "prestara" su nombre para que apareciera como dueño del caballo IL Corsario.

13. El Seguro Social del Sr. Salinas se deposita en su cuenta de Oriental Bank.

14. El septiembre de 2023, el Sr. Salinas recibió (y depositó en su cuenta de la Cooperativa Las Piedras) la suma de $75,000 producto de una demanda en contra del Hipódromo.

15. Su representante legal cobró un 33% de dicha suma.

16. De la cuenta de la Cooperativa Las Piedras el Sr. Salinas sacó $12,000 aproximadamente para invertirlos en Universal Insurance y ocasionalmente recibe unos dividendos.

17. Primeramente, el Sr. Salinas lo negó, pero luego reconoció que la Sra. Garrido de Universal fue la persona que lo ayudó a hacer esa inversión.

18. Del 2024 a marzo de 2025, cuando el Sr. Salinas trabajaba como entrenador de caballos, éste generaba mensualmente un promedio de $3,000 (algunos meses recibía más y otros meses recibía menos).

19. El Sr. Salinas nunca explicó por qué alegadamente ya no desempeña como entrenador de caballos y por qué alegadamente solo se desempeña como jurado hípico del Hipódromo Camareno y ganando $25 la hora y trabajando 29 horas semanales.

20. Asumiendo que sea verdad que el Sr. Salinas solo se desempeña como jurado hípico éste recibió $1,800.02 en marzo de 2025, $2,770.08 en abril de 2025, $3,139.28 en mayo de 2025, $3,015.27 en junio de 2025, $2,835.18 en julio de 2025 (hasta ese mes se realizó el descubrimiento de prueba a través de las órdenes emitidas por el Tribunal).

21. Esos dineros fueron depositados en la cuenta del Sr. Salinas del First Bank.

22. Además, el Sr. Salinas sigue recibiendo el 2% del premio cuando el caballo IL Corsario gana una carrera.

23. El Sr. Salinas insistió que el caballo IL Corsario es del Sr. Luis Passalaqua, pero nunca declaró que el 2% él se lo entregará aquél.

24. El Sr. Salinas declaró que el caballo IL Corsario no ha ganado carreras desde mayo de 2025.

25. De hecho, aunque el Sr. Salinas declaró que no recibe más ingresos y que tampoco deposita sus ingresos en su cuenta de la Cooperativa Las Piedras, desde julio de 2023 hasta mayo de 2025 aparecen un sinnúmero de depósitos a favor del Sr.

Salinas (aproximadamente $300 mensuales).

26. El Sr. Salinas declaró a preguntas de su abogado que solo gana $800 como jurado hípico y $348.00 mensuales por concepto del Seguro Social.

27. Sin embargo, a preguntas de la abogada de la Sra. Machado el Sr. Salinas declaró que se desempeña como jurado hípico del Hipódromo Camareno desde marzo de 2025 y gana $25 la hora y trabaja 29 horas semanales.

28. En suma, el Tribunal concluye que como mínimo el Sr. Salinas recibe un promedio de $3,000 mensuales como jurado hípico, $340 mensuales del Seguro Social, $300 mensuales que se le depositan en la Cooperativa Las Piedras, para un total de $3,640.

29. El Tribunal desconoce los gastos del Sr. Salinas porque éste se negó a descubrir prueba.

30. Por lo tanto, el Tribunal desconoce si el Sr. Salinas tiene alguna limitación para sufragar gastos médicos, si tiene unos gastos de nutrición en particular, alguna condición de salud que le aqueje, etc. Artículo 358 del Código Civil del 2020.

31. Como se adelantó, el Sr. Salinas declaró en Sala y lucía como un hombre saludable, ágil, inteligente y capaz.

32. La hija de esta pareja, Glorimar Salinas Machado, vive en Ohio con su pareja, tiene cáncer, no trabaja, pero aun así aporta a la Sra. Machado entre $200 a $300 mensuales para ayudarla económicamente.

33. Glorimar declaró que sus hermanos Pedro, que vive en California, y Alvin, que vive en una casa de Glorimar en Canóvanas, también ayudan económicamente a la Sra. Machado.

34. Pedro también le proveyó a su mamá una ATH para que ella saque/use dinero, pero al éste no declarar no se sabe a ciencia cierta cuánto es su aportación mensual.

35. Alvin es entrenador de caballos y también trabaja en el Caribe Hilton.

36. Pedro es bartender en California.

37. Los tres (3) hijos de esta pareja le han ayudado a costear los honorarios de abogado.

38. La Sra. Machado declaró que es ama de casa hace 40 años.

39. Esta vive en una égida en Carolina y paga $137 mensuales de renta, $19.40 mensuales de agua, $30 mensuales de luz, $353 mensuales de alimentos (sin embargo, en la declaración sobre sus gastos que se desprende del Exh. 1 indicó que gasta $122 mensuales

en alimentos, aunque varía), $110 mensuales de higiene personal (sin embargo, en la declaración sobre sus gastos que se desprende del Exh. 1 indicó que gasta $46.31 mensuales, aunque varía), $120 mensuales de ropa, $30 cada 6 meses de gastos dentales no cubiertos por el plan médico (equivale a $5.00 mensuales). entre $68 y $113 de gasolina mensuales, $115 de mantenimiento del vehículo cada 3 meses (equivale a $38.00 mensuales y ocasionalmente su hermana Vilma le ayuda con ese gasto).

40. La Sra. Machado recibe la pensión ex cónyuge de $500 mensuales, el Seguro Social de $133 mensuales, PAN $220 mensuales.

41. La Sra. Machado declaró que su hija Glorimar le aporta $120 mensuales a través de una ATH que aquélla le proveyó (pero Glorimar declaró que le aporta entre $200 a $300 mensuales.

42. La Sra. Machado declaró que su hijo Pedro le paga el gimnasio: $75 mensuales.

43. La madre de la Sra. Machado tiene 90 años y entre ésta y una hermana de la Sra. Machado de nombre Vilma, le pagan una guagua de $500 mensuales.

44. La Sra. Machado gasta $130 mensuales en salón de belleza (lavado/peinado) y $285 en tinte para el cabello cada 4 meses (equivale a $71.25 mensuales más $130 mensuales total: $201.25 en salón de belleza mensuales).

45. La Sra. Machado se retoca las uñas acrílicas cada 3 semanas (aunque no dijo cuánto gastaba en ese concepto se sabe que fluctúa entre $20 a $40).

46. La Sra. Machado se hace un retoque full una vez al año (aunque no dijo cuánto gastaba en ese concepto se sabe que fluctúa entre $40 a $80).

47. La Sra. Machado declaró que padece del corazón/aorta y que tiene pendiente realizarse un cateterismo, pero aún no sabe la fecha en que se lo realizará porque dependerá de la disponibilidad de su hija, que tiene cáncer, y de la pareja de ésta que también tiene pendiente una operación.

48. La mamá de la Sra. Machado que tiene 90 annos es cuidada por su otra hija Vilma.

49. La Sra. Machado no ha provisto en evidencia un documento fehaciente de establezca que no puede trabajar.

50. La Sra. Machado declaró que el Sr. Salinas "como hombre" "se supone" que le provea económicamente.

51. En la declaración sobre sus gastos que se desprende del Exh. 1 la Sra. Machado indicó que sus gastos

mensuales totales varían desde $869.69, a veces un poco más, pero a veces un poco menos.

Luego, conforme a estas determinaciones de hechos, la prueba documental presentada y el derecho aplicable determinó que no ocurrió un cambio sustancial en la situación económica del señor Salinas que justificara un aumento en la pensión excónyuge. De la prueba presentada, concluyó que actualmente el peticionario devenga aproximadamente $3,640 mensuales, provenientes de su labor como jurado hípico, pagos del Seguro Social y otros depósitos. Asimismo, destacó que, previo a marzo de 2025, éste generaba cerca de $3,000 mensuales como entrenador de caballos, además de los beneficios del Seguro Social, por lo que sus ingresos se han mantenido esencialmente constantes. Sostuvo que, tras cumplir con el pago de la pensión excónyuge de $500 mensuales —la cual puso al día—, el Sr. Salinas dispone de aproximadamente $3,140 mensuales para sufragar sus gastos personales, lo que evidencia su capacidad económica.

En cuanto a la recurrida, evaluó tanto sus ingresos como sus gastos mensuales. Determinó que sus gastos necesarios fluctúan entre $869.69 y $925 mensuales. Por otro lado, estableció que sus ingresos ascienden aproximadamente a $1,548 mensuales, incluyendo la pensión excónyuge, beneficios del PAN, Seguro Social, aportaciones económicas de sus hijos y una ayuda indirecta de $500 mensuales para el pago de su vehículo, sufragada por su madre y su hermana. A la luz de estos datos, concluyó que la recurrida cuenta con ingresos que exceden sus gastos básicos, lo que le permite cubrir sus necesidades esenciales.

De igual forma, tomó en consideración que ciertos gastos de la señora Machado, particularmente aquellos relacionados con servicios de salón de belleza y mantenimiento personal, no constituyen gastos necesarios. Este análisis reforzó la conclusión de

que no existe una necesidad económica apremiante que justifique un aumento en la pensión. En consecuencia, resolvió que no procede aumentar la pensión excónyuge solicitada. Por el contrario, determinó reducirla de $500 a $400 mensuales, efectiva el 1 de marzo de 2026. Fundamentó esta decisión en que la señora Machado posee ingresos suficientes para cubrir sus necesidades básicas, mientras que el señor Salinas mantiene la capacidad económica para cumplir con el pago de la nueva cuantía establecida.

Inconforme con este dictamen, el 19 de marzo de 2026, el peticionario presentó el recurso de epígrafe y formuló los siguientes señalamientos de error:

> **Erró y abusó de su discreción el TPI al no evaluar los factores del Art. 658 del Código Civil al determinar la capacidad económica de la parte peticionaria.**
>
> **Erró y abusó de su discreción el TPI al no relevar a la parte peticionaria de la pensión ex-cónyuge a pesar de que se demostró que no existía necesidad económica.**

Atendido el recurso, le ordenamos al peticionario a reproducir la transcripción de prueba oral de la vista celebrada el 9 de febrero de 2026. Posteriormente, este último compareció solicitándonos que le permitiéramos someter la regrabación de la vista ya que no contaba con el dinero para sufragar la transcripción. Ante ello, emitimos una *Resolución* concediéndole al señor Salinas hasta el 24 de abril de 2026, para presentar la regrabación de la vista. En cumplimiento con nuestra orden, el peticionario sometió la regrabación estipulada. Además, le concedimos al señor Salinas hasta el 30 de abril de 2026, para presentar su alegato suplementario de estimarlo necesario.

El 24 de marzo de 2026, la señora Machado presentó su *Moción en Oposición a Expedición del Recurso* y negó que el TPI cometiera los errores que el señor Salinas le imputó. Posteriormente, en cumplimiento con nuestra orden, el peticionario presentó su

alegato suplementario. Con el beneficio de la comparecencia de ambas partes, atendemos el asunto ante nos. *Veamos.*

## II.

### -A-

El *certiorari* es el vehículo procesal extraordinario utilizado para que un tribunal de mayor jerarquía pueda corregir un error de derecho cometido por un tribunal inferior. *Torres González v. Zaragoza Meléndez*, 211 DPR 821, 846-847 (2023). Los tribunales apelativos tenemos la facultad para expedir un *certiorari* de manera discrecional. Íd., pág. 847. Esta discreción se define como "el poder para decidir en una u otra forma, esto es, para escoger entre uno o varios cursos de acción". *García v. Padró*, 165 DPR 324, 334 (2005). Asimismo, discreción es una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justa. Íd., pág. 335. Ahora bien, la aludida discreción que tiene este foro apelativo para atender un *certiorari* no es absoluta. Íd. Esto, ya que no tenemos autoridad para actuar de una forma u otra, con abstracción total al resto del derecho, pues ello constituiría abuso de discreción. Íd. Así, "el adecuado ejercicio de la discreción judicial está inexorable e indefectiblemente atado al concepto de la razonabilidad". Íd.

La Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1, establece que el recurso de *certiorari* para resolver resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, será expedido por el Tribunal de Apelaciones cuando se recurre de: (1) una resolución u orden bajo la Regla 56 (Remedios Provisionales) y la Regla 57 (*Injunction*) de las Reglas de Procedimiento Civil; (2) la denegatoria de una moción de carácter dispositivo y; (3) por excepción de: (a) decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales; (b) asuntos relativos a privilegios probatorios; (c) anotaciones de rebeldía; (d)

casos de relaciones de familia; (e) casos que revistan interés público; y (f) cualquier otra situación en la que esperar a la apelación constituiría un fracaso irremediable de la justicia.

En otros términos, la Regla 40 del Tribunal de Apelaciones, *In re Aprob. Enmdas. Reglamento TA,* 2025 TSPR 141, pág. 63, 215 DPR ____ (2025), enmarca los criterios que debe evaluar este tribunal al expedir un auto de *certiorari.* La aludida regla establece lo siguiente:

> El tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de certiorari o de una orden de mostrar causa:
>
> (A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
> (B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
> (C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
>
> (D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
>
> (E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.
>
> (F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
>
> (G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

Ninguno de estos criterios es determinante por sí solo para el ejercicio de jurisdicción y tampoco constituyen una lista exhaustiva. *García v. Padró,* supra, pág. 335. La norma vigente es que los tribunales apelativos podremos intervenir con las determinaciones discrecionales del Tribunal de Primera Instancia cuando este haya incurrido en arbitrariedad, craso abuso de discreción o en un error en la interpretación o aplicación de cualquier norma procesal o de

derecho sustantivo. *Pueblo v. Rivera Santiago*, 176 DPR 559, 581 (2009).

III.

Luego de examinar la totalidad del expediente ante nuestra consideración incluyendo la regrabación estipulada de la vista evidenciaria del 9 de febrero de 2026, a la luz de los criterios de la Regla 40 del Tribunal de Apelaciones, *supra*, no identificamos razón por la cual este Foro deba intervenir con el dictamen recurrido. Ello, ya que no se configura ninguna de las situaciones que allí se contemplan. Recordemos que nuestro ordenamiento jurídico nos brinda la discreción de intervenir en aquellos dictámenes interlocutorios en los que el TPI haya sido arbitrario, cometido un craso abuso de discreción o cuando, de la actuación del foro, surja un error en la interpretación o la aplicación de cualquier norma procesal o de derecho sustantivo. Reiteramos que en el recurso que aquí atendemos no se nos ha demostrado que haya alguno de estos escenarios.

IV.

Por los fundamentos antes expuestos, ***denegamos*** el recurso de *Certiorari.*

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda.  Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones